ALLEN, P.
This case arises upon the sixth clause of the will of Joseph Toler deceased. By that clause he gave to his daughter Mary Bennett the land on which she then lived, and certain slaves; and the clause concludes with these words: “My will is at the death of my daughter Mary Bennett that the land and negroes given to her shall be equally divided amongst her children.” At the testator’s death his daughter was married to Bew'is Bennett, by whom she had several legitimate children. Previous to her marriage she had an illegitimate child 'by another man. The will bears date the 10th of July 1818, and was admitted to probate the 15th of November 1819. At the death of the testator the legitimate children and the bastard son were all living. And the only question is, whether the illegitimate child took a vested '^interest, equally with the lawful children of Mary Bennett under this clause of their grandfather’s will. It is said in 2 Jarman on Wills (2 Amer. edi. by J. C. Perkins) 94, “'to be an established rule, that a gift to children, sons, daughters or issue, imports prima facie legitimate children or issue, excluding' those who are illegitimate, agreeable to the rule, ‘Qui ex damnato coitu nascuntur, inter liberos non computen tur. ’ ” We have thus the rule that such a gift imports, not absolutely but prima facie legitimate children; and we have the ground on which it rests in the Batin maxim. The bastard is not computed *979 amongst children. “We term them all by the name of bastards that be born out of lawful marriage.” 1 'Thos. Coke 115. “A bastard is in law quasi nullius filius, because he cannot be heir to any.” Ifitt. 1 188. If possessed of personal estate, he dies intestate and without wife or children, the estate belonged to the crown; if of real estate, it escheated. Eor he was supposed to have no relations, no heirs or next of kin, except those arising from his own contract of marriage, his wife and children or descendants. In this state of the law, when the courts came to determine what was the import of the words children, &c., of necessity the word was construed to mean such as the law recognized as children. It was the obvious course to hold, that where a testator was in the act of making a disposition of liis estate, which the law permitted, and used a word which by law comprehended one class, he could not be supposed to intend a party who the law declared did not belong to the class named; to intend a person who in law was quasi nullius filius, without relations, heirs or next of kin, except his own wife and progeny. There was still another reason which would preclude the court from giving such an enlarged meaning to the words children, &c., when applied to the children or issue of a man. How was the fact of paternity to be ascertained ^except by going into an enquiry which the court could scarcely enter into upon the construction of a will. The birth of a child during a lawful marriage is prima facie evidence of its legitimacy. Eormerly so strict was the rule, that if the husband be within the four seas, no proof was admitted to prove the child a bastard, unless in case of apparent impossibility of procreation; though the strictness of this rule has long since been relaxed, and the presumption of legitimacy arising from birth in wedlock, may be rebutted by circumstances inducing a contrary presumption, as proof of non-access, &c., &c. Thomas’ Coke 109, n. B. But the presumption exists, until rebutted; and therefore, by the use of the words children, &c., in a devise or bequest, the testator must be understood to mean those who are by law presumed to be his children. But no such presumption can arise in respect to his illegitimate children. They still continue nullius filius as to the father. There must be some recognition ; something to show that in the particular instance, he did intend to describe the illegitimate child; and this intention must be arrived at by Home description which will serve to designate the individual, and not bjr naming a class which in law is not presumed to comprehend one of his condition. In the construction of wills in reference to this as to other subjects, the intention of the testator controls. The law contains no restriction upon the power of a testator to devise or bequeath to an illegitimate child. If it appears that the testator intended to make such a devise, effect must be given to the disposition.
It is said by Jarman, p. 94, “that illegitimate children, born at the time of making the will, may be the objects of a devise or bequest, by any description which will identify them. Hence, in the case of a gift to the natural child of a man, or of a woman, or of one by the other, it is simply necessary to prove ‘“That the objects in question had, at the date of the will, acquired the reputation of being such children. ” In the same connection, this author reviews the most prominent cases which have been decided on this question ; and it is observable that in most if not all the cases cited and commented on by him (except the case of Mortimer v. West, 2 Cond. Eng. Ch. R. 439, 3 Russ. R. 370), were devises or bequests to the illegitimate children of the father, or of a woman by a certain individual. The case last mentioned seems to have been the first in which it was held that a devise to the children of a woman without reference to the father, was bad; and the only subsequent case to which we have been referred of like import, is Dovex v. Alexander, 24 Eng. Ch. R. 275 (2 Hare 275), which arose on the construction of a deed.
But though one of the incidents, the uncertainty in regard to paternity does not exist in case of a devise to the children of a woman, without reference to the father; 3Tet the decision was the logical sequence of the first proposition, that by law the natural child is filius nullius, has no relation, and cannot inherit from or transmit inheritance to the mother. In legal language, he is not comprehended in the class of her children ; and therefore, as in the case of the putative father, the court could not say he was comprehended in that class by the use of the term. Whether upon a question of intention, this was not straining the rule to an unreasonable extent, is another question. The principle is the same in both cases. In contemplation of law they were not children; and the use of the word children was not sufficient to embrace them.
Some of the cases, as Wilkinson v. Adam, 1 Ves. & Bea. R. 422; Harris v. Lloyd, 11 Cond. Eng. Ch. R. 174, decide, that the face of the will alone can be looked to for the purpose of ascertaining the intention to apply to natural children. But this rule has been ^'innovated upon by other cases; as Beachcroft v. Beachcroft, 1 Mad. R. 430; Frazer v. Piggott, 1 Young. R. 354. But none of the cases interfere with the general rule, (hat illegitimate children may take if clearly designated by a description which identifies them.
Coke, as we have seen, terms all by the name of bastards that be born out of lawful marriage. Subsequent marriage and recognition do not legitimate; children of marriages within the prohibited degrees; of marriages not properly solemnized in proper place or by proper license or banns; of a marriage where there was a former marriage, or where the parties were imbecile —are bastards; and therefore inter liberos non computentur. Shelford Marriage & *980 Divorce, ch. 3, p. 154 to 157, 171-3, 9, 183, 5, 6, 190; Roper Husband & Wife 486. They have no heritable blood, and are not comprehended in the class of children when that word is used in a will, where there are or by possibility may be legitimate children to answer to the description. As where legitimate children were or might have been entitled under a bequest, this possibility excludes the illegitimate. Because children in its primary sense, we have seen, if unexplained, imports legitimate children only.
In Virginia a child born before marriage, born a bastard, if the parents afterwards marry, and he is recognized by the father, is legitimate. So the issue of marriages deemed null in law are legitimate; Code, p. 523; or of a woman by a second marriage which took place during the lifetime of the first husband. It would not be seriously maintained that under this legislation, persons in this condition would not in this state be comprehended by the word children. In England, as we have seen, they would not be, if there were legitimate children or the possibility of there being such children.
Yet both in England and Virginia *the intention of the testator controls in the construction of wills. And guided by this rule, the courts there hold such children not to be intended — here, that they are. And both are correct, for where words are used which in law have received a legal signification, the party is presumed to use them in that sense, unless the contrary appears. In England they are not computed as children, for not being born in lawful wedlock, the law does not presume them prima facie to be children. In Virginia, being' recognized after marriage, or being the issue of a marriage, though unlawful, the law prima facie presumes them to be children; declares them to be legitimate, and therefore necessarily computed as children whenever the word is used. To include them in England, there must be something amounting to an express desig-nado personarum applicable to them; in Virginia, to exclude them from the class in which the law here comprehends them, there must be something to show clearly that such was the intention.
This brings us to the enquiry as to the condition of children in Virginia not born in wedlock or recognized by the father after marriage. On the paternal side their condition is unchanged. As to him the bastard is still quasi nullius filius; the law indulges no presumption as to his paternity. If acknowledged by the father, that is a fact to be proved, not a presumption of law. A devise or bequest to him by his reputed or acquired name, is g'ood, whether made by his father or a stranger; a bequest to children, if there be legitimate children, does not comprehend him, because there is no legal presumption that he is a child.
But how is it ex parte materna? as to her, does he, as in England, remain quasi nullius filius? without relation, without next of kin, except his own wife and progeny? Or, does the law recognize him as her *child; embrace him in the description of her children? The solution of these questions is to be found in our statute of descents, as construed by this court. The Code, ch. 123, § 5, p. 522; 1st Rev. Code 355, § 2, 18, provides that where any person having title to real estate of inheritance shall die intestate as to such estate, it shall descend and pass in parcenary to such of his kindred, male and female, as are not aliens, in the following course: 1, to his children and their descendants. And further: “Bastards shall be capable of inheriting and transmitting inheritance on the part of their mother, as if lawfully begotten.” The framers of this act we are told by Carr, judge, in Davis v. Rowe, 6 Rand. 364, “looked at the common law canons of descent to avoid, not to imitate; to pull down, not to build up. All its principles are violated; its landmarks removed, its fences broken down, its traces obliterated.” Its basis (says Judge Parker in Garland v. Harrison, 8 Leigh 368, referring for his positions to the opinions of Judges Tucker and Roane in Stones v. Keeling, 5 Call 143, 147, 148, “was the statute of distributions and the civil law. It is founded on the great principles of justice. Its object was to make such a will for the intestate as he would himself probably make; and its obvious policy was to follow the lead of the natural affections, and to consider as most worthy, the claims of those who stand nearest to the affections of the last occupant. It ought therefore at all times to be liberally construed in favor of those to whom the intestate himself, had he made a will, might be supposed to be most favorable, without reference to common law rules or feudal disabilities.”
Under the influence of these principles, the judges in Garland v. Harrison proceeded to the construction of the provision of the act of descents, declaring that bastards shall be capable of inheriting and transmitting inheritance on the, part of their mother, as if lawfully begotten: and the ^result can be best arrived at by quoting their own expressions. After enumerating his common law disabilities, Judge Parker says: “It was the object of the law to give the bastard a mother, and to place him in all respects on the same footing as a lawfully begotten child, born of the same mother.” Again, after commenting on § 6, Code, ch. 123, and § 19, 1 Rev. Code, p. 357, declaring that a child born before marriage and the parents intermarry, if recognized by the father, shall be deemed legitimate, he says, “I have no doubt that it was intended bjr the section respecting bastards, to bestow upon illegitimate children the same capacities of inheriting from or through the mother, and' passing inheritances to or through her, as they possess under the other section in respect to both parents; that is to sa3r,.to make them in all respects the legitimate children of their mother.” And again: “These relaxations of the severitj' of the *981 common law rest upon the principle that tlie relation of parent and child, which exists in this unhappy case, in all its binding' and native force, ought to produce the ordinary consequences of consanguinitj7; and I am convinced that it was the intention of the legislature of Virginia to adopt the most liberal rule in respect to an inheritance in case of bastardy, that was consistent with the certain ascertainment of the parents.” So Judge Brockenbrough, in the same case, says, “A bastard may inherit on the part of his mother in like manner as if he were her legitimate son. He may therefore inherit from his mother or from his maternal grandparents in the direct line,” &c. And again: “He cannot have whole brothers, but every uterine brother, whether legitimate or spurious, is his half brother.” And President Tucker, in the same case, remarks, “To declare them legitimate, would have been at once to provide, not a mother only, but a father. To such a length the lawmakers were not '^prepared to go. They were compelled to adopt another phraseology— to use language which, in relation to the mother and her kindred, would put bastards oil the footing of legitimates, while it would leave them, as heretofore, in relation to the father, the sons of nobody. But this was the only difference they could have designed.” And in conformity with these views, reiterated in every variety of form, it was held in that case, overruling entirely Stevenson’s heirs v. Sullivant, 5 Wheat. R. 207, that the estate of the bastard dying intestate, passed to his mother and to his two uterine bastard brothers.
Comment on these opinions is almost unnecessary. At the common law he had no mother; this statute gives him one. He is placed in all respects upon the same footing as a lawfully begotten child born of the same mother. He is therefore no longer, as to her, quasi filius nullius, but her child, inheriting from and through her, transmitting inheritance to and through her. If seized of property, she dies intestate, the act says it shall descend and pass in parcenary to such of her kindred, &c., in the following course — first, to the children and their descendants. If she dies leaving illegitimate and legitimate children, does not the word children comprehend all in the same class? Would it be argued that the illegitimate child would not take with the legitimate children? And when, as we have seen from the extracts aforesaid, this law, as expounded, includes all her children, legitimate and illegitimate, in the same class as her children, so ascertained by birth, not by legal presumption, and for every purpose, as if all were lawfully begotten, what warrant is there for fhe pretension that the same general term, when used in a will, is to be construed as excepting them for any purpose? If the term children is to be construed in regard to both parents, as including the child recognized, or to be deemed legitimate, being *born in wedlock, though illegal because the testator, by the use of the general phrase, is to be, must be held to use it in the sense of the law, there being nothing to show he uses it in another sense. Must we not apply the same rule when the word is used in reference to the illegitimate child of the female? The law declares the estate shall pass and descend to her children ; being a child, he is heir, joint heir with every other child born in or out of wedlock; comprehended in the class, not by any personal designation, but by the general word children, comprising all.
In Edwards v. Freeman, 2 P. Wms. R. 435, 441, Lord Raymond says, “The statule of distributions makes such a will for the intestate, as a father, free from the partiality of affections, would himself make; and this I ca.U a parliamentary will.” So in Garland v. Harrison, Parker, judge, says, “The intention was to make such a will for the intestate as, if he had died testate, he would have been most likely to have made for himself. ’ ’ And Tucker, president, says, in the same case, “Our law of descents was formed in no small degree upon the human affections; the legislature very justly conceiving that the object, of a law of descents was to supply the want of a will, and that it should therefore conform in every case, as nearly as might be, to the probable current of those affections which would have given direction to the provisions of such will. Under the influence of these opinions, they legislated in relation to bastards.”
As a legislative will, we have seen that the word children includes the legitimate and illegitimate children of a woman in the same class, placing all the issue of the woman upon the same footing as if born in wedlock. When the testator comes to write his own will, and uses the same words, which in the legislative will comprehends all, comprehends them because of the supposed conformity to the probable current of those ^'affections which would have given direction to the provisions of a will, if he had written it, we are asked to say he does not intend to comprehend all, but to exclude the illegitimate child. The law declares the words in the legislative will includes; the court in expounding the law is asked to say the same words used by the testator in reference to the same matter, excludes them. By the statutory will they are her children ; by the written will ihey continue, as to her, quasi nullius filius, and subject to the common law disabilities of bastards. And this construction is invoked, notwithstanding we are informed by the judges, in the case referred to, fhat the statute should at all times be liberally construed in favor of those to whom the intestate himself, had he made a will, might be supposed to be most favorable, without regard to common law rules or feudal disabilities. In Sleigh v. Strider, 5 Call 439, it was decided that a child born out of wedlock in the year 1774, was legitimated by the subsequent marriage and acknowledgment of parents in 1776, which *982 was before the passage of the law of 1785, which took effect January 1, 1787. Stones v. Keeling, 5 Call 143, decided, that the issue of a woman by a second marriage, which took place during the lifetime of her first husband, are legitimate after the death of their father. These cases, and the case of Garland v. Harrison, all show, that this, law has invariably been liberally construed by this court in favor of the class intended to be relieved from common law disabilities.
If we depart from the rule of construction as laid down by the English cases, that by the use of a phrase which has received a legal signification as comprehending a particular class, the testator must have intended to use it in the same sense, when treating of the same subject matter, we are at sea without compass or rudder. In the place of a clear, definite rule, the discretion of the judge is to be substituted. The ^'enquiry is, who'are the beneficiaries intended by the testator? He has used a phrase referring to a class, and the question is, who are comprehended in it? The-English courts say, in view of their law, he must have intended legitimate children, because the illegitimate children are not by law treated as children, and because where the children of a man are spoken of, there is no presumption of paternity, except in the case of childre'n bora in wedlock. If it is attempted to bring in illegitimate children, it must be done by proof, and the hazard is encountered of giving his estate to aliens to his blood; to persons never acknowledged by him as children. And as none are legitimate who were not born in lawful wedlock, the children of marriages deemed void, &c., cannot be distinguished from such as are born in a state of concubinage; it is in law concubinage, and therefore-no presumption can arise in favor of the children. And the same principle, by a too rigid adherence to the rule, has been applied to the children of a woman; giving, as to her, more weight to a fiction of law than to the palpable fact that the illegitimate child is her offspring.
But if there be no legitimate children or possibility of legitimate children, as in case of a devise to the children of a man deceased, but there were illegitimate children, they must have been intended, as none other answer the description. In Virginia, guided by the same rule of carrying out the intention, the children of a man born in a'state of concubinage, would not be considered as falling within the class of children so as to take by such general description. As to the father, the bastard remains nullius filius, and there is no legal presumption as to his paternity. But I take it to be too clear a proposition to require arguiftent to prove it, that in Virginia a child born before marriage, but afterwards recognized by the father who intermarries *with the mother, or born of a marriage null in law, but by statute deemed legitimate, would in a devise or bequest to children be held to be included with other legitimate children, unless expressly excluded, in conformity with the principle of the English rule; because by the recognition or the birth in wedlock, the law presumes them to be children: though in England it would be otherwise. And so adhering to the principle of the rule, when the law makes the bastard child of a woman her child; endows him with every attribute of a child born in wedlock; includes him in the very class designated as children, to whom her estate is to pass in the event of her dying intestate; a testator speaking of her children, the words must be construed to include in the class all who in law are her children. Instead of departing from, such construction adheres to and carries out the rule. The contrary construction substitutes unlicensed discretion, and involves the courts in a labyrinth without a clew to direct them.
It has been suggested, that this is a will not of the mother, but of the grandfather; and we cannot presume he intended to provide for the child of his daughter’s shame. The law presumes otherwise; for if his daughter had been dead, and he had then died intestate, in the statutory’will made for him, this child would, equally with the legitimate children have been provided for; and in the language of the judge in Black v. Cartmell, 10 B. Monr. R. 188, it might be furthermore said, “that it cannot be assumed, or even presumed, that if she had an illegitimate son when the will was made, her father vfould, on account of her fault, have excluded his unoffending grandchild from all participation in his estate, and left him a vagabond dependent upon the charity of others for sustenance and education.” Perhaps, indeed, consideiúng that no matter by whom begot, the relationship to the grandfather was the'same, and his necessities the greater, *such presumption that he did not intend to include (or rather that he intended to exclude, for the law includes), would be contrary to the fact. And at best, it would be substituting vague conjecture for a certain rule.
The argument against the policy of such construction as affecting female purity and public morality (springing perhaps originally out of the maxims of a fulfilled dispensation, which visited upon the children, to the third and fourth generation, the sins of the parent), may be met by the enquiries of Tucker, president, in Garland v. Harrison, “was the policy of the marriage institution more fatally invaded by concubinage than by bigamy? Was illicit intercourse out of wedlock more to be deprecated than incest in wedlock?” Yet the fruits of such intercourse are legitimate. And in the Lessee of Brewer v. Blougher, 14 Peters’ R. 178, which arose under a law similar in substance to ours as to bastards, the court decided that the issue of an incestuous marriage between father and daughter, though illegitimate, were embraced by the statute. Chief Justice Taney says, “the right to inherit would appear to *983 have been given upon the principle, that it would be unjust to punish the offspring for the crime of the parents; and their right therefore is not made to depend upon the degree of guilt of which they were the offspring.” But in the language of Judge Brockenbrough in Garland v. Harrison, this argument as to public policy “is a consideration which would be more appropriately addressed to a legislative body than a judicial tribunal.” And there 1 leave it. It is for that body to give the law; for this to declare it.
The rule of the English courts had no reference to questions of public policy. It rested upon the intention of the testator, and the mode of arriving at it. The right of an illegitimate child to take, if the testator so intended, was never questioned; and this under "'circumstances more likely to affect public morals than a construction which includes a bastard amongst the children of his mother under our statute. Jarman, p. 112, deduces these rules, amongst others from the cases: That illegitimate children may take by any name or description which they have acquired by reputation at the time of making the will: That legitimate and illegitimate children may take concurrently under a designatio personarum applicable to both: That a gift to an illegitimate child en ventre sa mere without reference to the father, is indisputably good: And that it is questionable whether, at this day, a gift to the future illegitimate child of a woman would be sustained on the ground of public morals; though there are dicta which would seem to lead to a different conclusion.
These conclusions show the length to which the English courts have gone in giving effect to the dispositions of testators when the intention is clear; though such dispositions may not commend themselves as calculated to preserve purity in the sexual relations.
I think the illegitimate child in this case was by the law of Virginia within the class comprehended by the word children of a woman: that by the use of the word here the testator must be intended to have referred to and included him with the other children of his daughter, whether born in wedlock or not, and that he takes equally with them, there being nothing in the case to show an intention to exclude him.
I am for affirming the decree with damages and costs.
DANIEE, EEE and ROBERTSON, Js., concurred in the opinion of Allen, P„
MONCURE, J., dissented.
Decree affirmed.